## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 18-20584-CR-MARTINEZ/AOR

UNITED STATES OF AMERICA,

v.

SURMONDREA MCGREGOR,

     Defendant.

_____/

### REPORT AND RECOMMENDATION

THIS CAUSE came before the Court upon Defendant Surmondrea McGregor's ("Defendant" or "McGregor") Motion to Suppress Physical Evidence (hereafter, "Motion to Suppress") [D.E. 20]. This matter was referred to the undersigned by the Honorable Jose E. Martinez, United States District Judge, pursuant to Title 28, United States Code, Section 636 [D.E. 24]. The undersigned held an evidentiary hearing on this matter on September 13, 2018 [D.E. 30]. For the reasons stated below, the undersigned respectfully recommends that McGregor's Motion to Suppress be DENIED.

### PROCEDURAL AND FACTUAL BACKGROUND

On July 5, 2018, McGregor was charged by way of Indictment with the following offenses:

Count 1:    Possession of a Firearm by a Convicted Felon, on February 23, 2018, in violation of 18 U.S.C. § 922(g)(1).

Count 2:    Possession of Fifteen or More Unauthorized Access Devices, on February 23, 2018, in violation of 18 U.S.C. § 1029(a)(3).

Counts 3-5:    Aggravated Identity Theft, on February 23, 2018, in violation of 18 U.S.C. § 1028A(a)(1).

See Indictment [D.E. 1].[1]

At the time of these charges, McGregor was a probationer in Florida state court and subject to home visits by his probation officer.  After one such visit, the probation officer conducted a probation search with the assistance of Miami-Dade Police Department ("MDPD") officers.  Thereafter, the MDPD officers obtained a search warrant, which resulted in the seizure of a gun and Personal Identifiable Information ("PII").   In seeking to suppress these items, Defendant contends that law enforcement lacked reasonable suspicion to conduct the probation search.  Defendant further argues that, although a search warrant was obtained after the probation search was conducted, the gun and PII that he seeks to suppress were seized by the MDPD officers prior to issuance of the warrant.

## APPLICABLE LAW

### 1.  The Fourth Amendment's protection against illegal searches

"[T]he Fourth Amendment's protection against unreasonable searches and seizures applies to probationers." Owens v. Kelley, 681 F.2d 1362, 1367 (11th Cir. 1982).  As to probationers, however, the lesser standard of "reasonable suspicion" is sufficient to satisfy the requirements of the Fourth Amendment. United States v. Knights, 534 U.S. 112, 121 (2001).  Thus, a finding of reasonable suspicion renders a warrantless search of a probationer's home legal under the Fourth Amendment. United States v. Wasser, 586 F. App'x 501, 504 (11th Cir. 2014).

"The degree of individualized suspicion required of a search is a determination of when there is a sufficiently high probability that criminal conduct is occurring to make the intrusion on the individual's privacy interest reasonable." Knights, 534 U.S. at 121.  The existence of reasonable suspicion is based on an objective test and must take into account the totality of the

[1]  McGregor's co-defendant, Ricky Fernetus ("Fernetus"), is also charged with possession of authorized access devices and aggravated identify theft. Id.

2

circumstances.  <u>United States v. Robinson</u>, 515 F. App'x 790, 791-92 (11th Cir. 2013); <u>United States v. Perkins</u>, 348 F.3d 965, 970 (11th Cir. 2003).

### 2.     Fruit of the poisonous tree

Under the long established exclusionary rule, "evidence seized during an unlawful search [can] not constitute proof against the victim of the search." <u>Wong Sun v. United States</u>, 371 U.S. 471, 484 (1963) (citing <u>Weeks v. United States</u>, 232 U.S. 383 (1914)).   "The exclusionary prohibition extends as well to the indirect as the direct products of such invasions." <u>Id.</u> at 484-85 (citing <u>Silverthorne Lumber Co. v. United States</u>, 251 U.S. 385 (1920)).

## FINDINGS OF FACT

### I.     Testimonial and documentary evidence

1.     The following witnesses testified at the September 13, 2018 evidentiary hearing: Probation Officer Kimberly H. Schultz ("Officer Schultz"); MDPD Detective Sergio Pagliery ("Detective Pagliery"); MDPD Detective Yunieski Arriola ("Detective Arriola"); MDPD Detective Jonathan Ortiz ("Detective Ortiz"); MDPD Sergeant Thomas Martinez ("Sergeant Martinez"); Fredina McGregor ("Ms. McGregor"); and Malek Barr ("Mr. Barr").

2.     The following documents were admitted into evidence Government's Exhibits 1A, 1B, 1C, and 2-11.

### II.     Facts

#### A. *Officer Schultz*

3.     Officer Schultz has been employed by the Florida Department of Corrections as a Correctional Specialist since 1996.  In her 22-year career, she has handled approximately two thousand cases and conducted hundreds of probation searches.

4.     Officer Schultz has conducted the majority of those probation searches with law

enforcement present for security, safety, transport purposes, and in case something is found.

5.    The police officers who assist with probation searches are armed.  Officer Schultz is also armed.

6.    During the course of her work, Officer Schultz has smelled marijuana approximately two hundred times.  In about 40 to 50 percent of her probation searches, she has encountered marijuana.  She considered her ability to smell marijuana to be very good.

7.    Officer Schultz was McGregor's probation officer on three felony cases for which he had served a term of imprisonment.  McGregor was subject to three probation orders dated August 31, 2016, which were in effect in February 2018.  See Gov't Exs. 1A, 1B, 1C (hereafter, "Standardized Probation Orders").

8.    Standard Condition 4 of the Standardized Probation Orders states: "You will not possess, carry or own any firearm.  You will not possess, carry, or own any weapon without first procuring the consent of your officer."  Id.

9.    Standard Condition 7 of the Standardized Probation Orders states: "You will not use intoxicants to excess or possess any drugs or narcotics unless prescribed by a physician.  Nor will you visit places where intoxicants, drugs or other dangerous substances are unlawfully sold, dispensed or used."  Id.

10.    Standard Condition 9 of the Standardized Probation Orders states:  "You will promptly and truthfully answer all inquiries directed to you by the court or the officer, and allow your officer to visit in your home, at your employment site or elsewhere, and you will comply with all instructions your officer may give you."  Id.

11.    On July 17, 2017, McGregor acknowledged receipt of "Instructions to the Offender."  See Gov't Ex. 2.  These instructions, which were in effect on February 23, 2018,

included the following:

> HOME VERIFICATIONS
> Probation officers will conduct home verifications routinely and need to have access to your residence.   Probation officers have the right to search your residence.

Id.

12.     On February 23, 2018, Officer Schultz was conducting home visits as part of her duties.  This included visiting McGregor at his residence, located at 2100 Northwest 54th Street in Miami.   Officer Schultz had previously visited McGregor at the same address on two occasions.

13.     The residence is located on the second floor.  On the day of the visit, Officer Schultz walked up the stairs, knocked on the door, and McGregor opened it.  As she stood outside the door, Officer Schultz could smell marijuana.

14.     Officer Schultz had also observed some cars in the parking lot that looked like they were totaled and, upon inquiry from a young kid who was sitting outside, learned that the cars belonged to the occupants of McGregor's residence.

15.     As a result, Officer Schultz contacted a police sergeant from the City of Miami to ask for assistance in conducting a probation search.  The police sergeant advised her that he had seen McGregor on Snapchat with a gun.  He also advised her that, based on the location of the residence, she needed to contact MDPD.

16.     Officer Schultz did so, and MDPD officers agreed to meet with her and assist her with securing the premises so she could conduct a probation search.

17.     At the meeting with the MDPD officers, Officer Schultz went over her findings, namely, the smell of marijuana, the presence of the totaled cars, and McGregor's picture with a gun on Snapchat.  She also made the MDPD officers aware of the fact that McGregor was on

probation.

18.     After the meeting, Officer Schultz and the MDPD officers drove to McGregor's residence.  Officer Schultz drove separately.

19.     When Officer Schultz and the MDPD officers arrived at the residence, they walked upstairs together.  Officer Schultz then knocked on the door and, when the door opened, she and the officers walked in and the officers secured the premises.

20.     Officer Schultz noticed a strong odor of marijuana, similar to what she had noticed earlier, still present from the outside and as she continued walking into the house.

21.     There were several people in the house, so the MDPD officers brought everybody to a central location to ensure Officer Schultz's security.  The MDPD officers did not handcuff anybody at that time and did not use any force or intimidation to bring the occupants out of the residence.

22.     After the occupants were outside, Officer Schultz walked towards the back of the house where the rooms are located.  In one bedroom, she observed marijuana adjacent to the bed, sitting on a counter.  She also saw a health-related paper that was folded; she opened it up; and she saw McGregor's name on it.  See Gov't Exs. 3, 4, 5, 6.

23.     After finding these items, Officer Schultz walked back to the MDPD officers and told them about it.  They looked at what she found and decided to seek a search warrant.

24.     While the MDPD officers prepared the search warrant inside the residence, Officer Schultz waited outside, speaking to McGregor and the owner of the apartment.

25.     Officer Schultz did not stay for the execution of the search warrant and left around noon.  According to a note made by Officer Schultz, McGregor was drug tested at the probation office at 12:20 p.m.  He tested positive for marijuana.

26.     An MDPD officer took McGregor to the probation office and then took him back to the residence.  Officer Schultz drove to the probation office separately.

27.     Although McGregor indicated on the drug test form that he had used marijuana on February 20th, Officer Schultz believed the use had occurred on February 23rd because the odor inside and outside the residence was very strong on that day.

28.     Officer Schultz later learned that MDPD officers were planning to arrest McGregor.  Officer Schultz did not participate in the arrest but she wrote a probation violation memorandum.

29.     On cross-examination, Officer Schultz testified that she first arrived at McGregor's residence at 8:00 a.m.; and that she returned to the residence with the MDPD officers at 10:10 a.m.

30.     Officer Schultz clarified that, on her 8:00 a.m. visit, she remained at the doorway and did not conduct any search of the residence.

31.     Officer Schultz could not recall if she saw the Snapchat picture of McGregor with a gun before going back to the residence to conduct the probation search.  She did not believe that anyone saw the picture in her presence that morning.

32.     The City of Miami police sergeant who alerted Officer Schultz to McGregor's Snapchat picture knew who McGregor was based on his regular perusal of Facebook and other social media pages.

33.     After she spoke with the City of Miami police sergeant, Officer Schultz contacted Assistant State Attorney Santiago Aroca ("ASA Aroca") to ask him for a contact at the MDPD. ASA Aroca eventually went to McGregor's residence, when Officer Schultz was getting ready to leave around noon.

34.     There were three other males at McGregor's residence when Officer Schultz and the MDPD officers arrived for the probation search.   Initially, none of the four males were handcuffed, but ultimately they were.  Officer Schultz could not recall when that occurred.

35.     Officer Schultz could not recall whether the MDPD officers walked into McGregor's residence with guns drawn when they arrived around 10:00 a.m.

36.     According to Officer Schultz, four to six MDPD officers went to McGregor's residence to assist with the probation search and they all stayed outside, in the upstairs landing area, while she conducted the search.  The occupants of the house were also in that area.

37.     On re-direct examination, Officer Schultz reiterated that her reasons for deciding to conduct a probation search were: a strong odor of marijuana; the two cars she saw in the parking lot; and her conversation with the City of Miami police sergeant about the Snapchat picture of McGregor with a gun.

38.     The undersigned found Officer Schultz's testimony to be credible.

**B. *Detective Pagliery***

39.     Detective Pagliery has worked at MDPD for five years and is assigned to the homicide street violence task force.

40.     Detective Pagliery has worked in over fifty marijuana investigations and has smelled marijuana over one hundred times in the course of his career.  He has assisted in over twenty probation checks, providing security for probation officers.

41.     On February 23, 2018, Detective Pagliery was assigned to assist Officer Schultz in connection with a probation check.  Prior to conducting the check, he met with Officer Schultz at a briefing conducted at MDPD's Northside station.

42.     During that briefing, Detective Pagliery learned that McGregor had been seen on

a social media posting posing with a firearm and saw a picture of the posting. See Gov't Ex. 7. Detective Pagliery also learned that Officer Schultz had smelled marijuana coming from McGregor's residence earlier that morning. Detective Pagliery knew that McGregor was not allowed to possess marijuana or a firearm.

43.     After the briefing, Detective Pagliery traveled to McGregor's residence at 2100 Northwest 54 Street, Apartment B, in Miami.

44.     When Detective Pagliery and his MDPD squad arrived at the apartment, Officer Schultz knocked on the door, and the door was opened. At that point, the MDPD officers asked the occupants to step out of the residence.

45.     The MDPD officers then conducted a protective sweep. According to Detective Pagliery, the officers had their guns drawn to protect themselves in case there was someone else in the apartment who had not stepped out and was armed. Detective Pagliery testified that it is standard procedure for MDPD officers to have their guns drawn when conducting a protective sweep, but he did not believe that Officer Schultz had her gun drawn.

46.     According to Detective Pagliery, none of the occupants were placed in handcuffs at that point in time and no physical force or threats were used against them.

47.     After the protective sweep was completed, the MDPD officers stepped outside and Officer Schultz conducted her probation check.

48.     Officer Schultz located some marijuana and alerted the MDPD officers. At that point, Detective Ortiz entered the residence, observed the marijuana, everyone stepped out of the house and the house was secured for a search warrant. Afterwards, the door was closed and no one was allowed inside.

49.     Detective Pagliery remained outside in the landing, sometimes going downstairs.

The occupants also remained outside in the landing.

50.     Detective Pagliery participated in the execution of the search warrant.  See Gov't Ex. 8.[2]  In addition to marijuana, the following items were collected: a gun with a clear extended magazine; and PII.  After the search, MDPD officers arrested the occupants of the residence.

51.     On cross-examination, Detective Pagliery testified that the MDPD squad consisted of approximately five officers.

52.     Detective Pagliery acknowledged that Detective Ortiz went into the residence before the search warrant was obtained to observe the marijuana that Officer Schultz had located in the course of the probation search.  Detective Pagliery testified that no search was conducted by MDPD officers prior to obtaining the warrant.

53.     According to Detective Pagliery, the MDPD officers first arrived at McGregor's residence at approximately 10:30 a.m.  He smelled potent marijuana at the front door.

54.     Detective Pagliery testified that the gun was found in a closet in the living room area, along with one sheet of PII.  The rest of the PII was found in the northeast bedroom.

55.     On re-direct examination, Detective Pagliery testified that, in the course of executing the search warrant, additional marijuana was found beyond that found by Officer Schultz in the bedroom during the probation search.  The second batch of marijuana was located in the living room on a small plastic plate.

56.     The undersigned found Detective Pagliery's testimony to be credible.

*C.  Detective Arriola*

57.     Detective Arriola works at MDPD.

58.     On February 23, 2018, Detective Arriola received a call from ASA Aroca requesting assistance for Officer Schultz in conducting a probation search.  Detective Arriola

---

[2]  The search warrant is dated February 23, 2018 at 1:24 p.m.  Id.

received that call sometime before 10:00 a.m. and then reached out to Officer Schultz.

59.     Officer Schultz stated that she required assistance because there were multiple individuals and a strong odor of marijuana at the residence of McGregor, who was a probationer. She also mentioned that two vehicles that were parked in the driveway of the parking lot were suspicious of possibly being stolen.

60.     A little after 10:00 a.m., Detective Arriola and his squad met with Officer Schultz at the Northside station, and afterwards proceeded to the McGregor residence.  The squad consisted of Detectives Arriola, Ortiz, Pagliery, Robles and a uniformed police officer.

61.     At the meeting, which was quick, Officer Schultz explained what had transpired before.  Detective Arriola did not recall seeing any photographs during the meeting.  However, he had been advised a couple of days earlier by Detective Borrego, who worked with the City of Miami gangs unit, of a social media picture showing McGregor holding a clear magazine with live ammunition.

62.     According to Detective Arriola, the MDPD squad arrived at McGregor's residence after 10:00 a.m.

63.     When asked about ASA Aroca, Detective Arriola testified that he arrived at the McGregor location while the officers were typing the warrant.  Detective Arriola did not recall ASA Aroca going into the apartment.  According to Detective Arriola, it is common in the Northside district for the assigned ASAs to come out to search locations.

64.     When Officer Schultz and the MDPD officers arrived at McGregor's residence, Officer Schultz knocked on the door and made contact with McGregor.  Then everyone inside the residence was asked to come out while she conducted the probation search.

65.     According to Detective Arriola, none of the officers had their guns drawn when

Officer Schultz knocked on the door or when the occupants were asked to step out.

66.     After the occupants stepped out, Officer Schultz went inside and conducted the probation search.  During that time, the MDPD officers remained outside with the occupants at the second floor landing, with some of the officers going downstairs.

67.     Detective Arriola testified that none of the MDPD officers entered the apartment prior to Officer Schultz conducting the probation search.  He also testified that the occupants were handcuffed after Officer Schultz found marijuana in the apartment.

68.     After Officer Schultz found marijuana, Detectives Arriola and Ortiz went inside the apartment to verify her finding.  Afterwards, they obtained a search warrant.

69.     After the search warrant was issued, two dogs from the canine units were brought to the scene.

70.     Detective Arriola could not estimate when the search warrant was approved, but he noted that some problems arose with transmitting the signatures of the affiants to the judge, which problems were ultimately resolved.

71.     Once the search warrant was being drafted, nobody went in or out of the apartment.

72.     Detective Arriola and Ortiz executed the search warrant, along with the canine units.

73.     One of the dogs alerted to marijuana underneath a sofa in the living room, which Detective Arriola witnessed.  Thereafter, he went outside to collect DNA samples from the occupants.

74.     Three occupants were arrested: Barr, for whom there was an outstanding warrant; Fernetus; and McGregor.

75.     On cross-examination, Detective Arriola testified that the photograph of marijuana in the bedroom portrayed in Gov't Ex. 6 indicated to him that people had been smoking marijuana in the apartment.  Detective Arriola also testified that, when he first arrived at the apartment, he smelled fresh and smoked marijuana, which was very potent.

76.     Detective Arriola also testified that, after the occupants were told to step outside of the apartment, the MDPD officers conducted a protective sweep and that, for such task, the officers usually have their guns drawn.

77.     Detective Arriola also testified that, when he first spoke to Officer Schultz on the phone, she told him that she had smelled marijuana at the apartment.

78.     Detective Arriola also testified that he was aware of the social media picture of McGregor holding a gun through Detective Borrego from the City of Miami.  Detective Arriola believed that Officer Schultz may have also been aware of the social media picture.

79.     The undersigned found Detective Arriola's testimony to be credible.

**D. Detective Ortiz**

80.     Detective Ortiz was involved in the probation search of McGregor's residence on February 23, 2018.  At that time, Detective Ortiz was familiar with McGregor from other investigations.

81.     Detective Ortiz attended a briefing that was conducted at the Northside station, in which Detectives Arriola, Pagliery and Robles, and a uniformed officer also participated.  They discussed where they would be going, what time they would head out, and the purpose of the activity, which was to assist a probation officer.  Officer Schultz had advised that she had been at the McGregor residence earlier but felt that conditions were not safe for her to conduct the probation search alone.

82.     Detective Ortiz recalled seeing a photograph of McGregor possessing a gun with a clear magazine at some point between the briefing at the Northside station and the time of the search of McGregor's residence.

83.     The group arrived at the residence, took some positions to secure it, and allowed Officer Schultz to approach the door.

84.     Detective Ortiz did not recall having his gun drawn at that time.

85.     When McGregor answered the door, Officer Schultz advised him that she was there to conduct a probation search.  At that point, all the occupants stepped out.  Also, at some point, the occupants were handcuffed, but Detective Ortiz could not recall when that happened.

86.     Detective Ortiz testified that neither he nor the other officers searched the apartment prior to Officer Schultz conducting the probation search.  But he did acknowledge that, prior to the probation search, the officers entered the apartment to conduct a security sweep and that firearms may have been drawn at that time.

87.     Officer Schultz came out and reported that she had found marijuana in the bedroom.  Detective Ortiz then went in with Detective Arriola to witness the marijuana since they would be the affiants for the search warrant.

88.     The occupants who were waiting outside were on the second story landing.

89.     ASA Aroca responded to the scene once it was determined that a search warrant would be sought, but he did not enter the apartment.

90.     Detective Ortiz participated in the execution of the search warrant, along with Detectives Robles and Arriola and Sergeant Martinez.  There were two canine units, one of which alerted to marijuana under a couch.

91.     Detective Ortiz found the gun and PII.

92.     Some of the PII was found in a bedroom and some was found in a closet where the firearm was found.

93.     The undersigned found Detective Ortiz's testimony to be credible.

**E.  Sergeant Martinez**

94.     Sergeant Martinez was present at McGregor's residence for the execution of the search warrant.  He did not participate in any prior activities.

95.     His role was limited to observing the marijuana that was recovered.  He learned from Detective Ortiz that a gun was found in a closet.

96.     The undersigned found Sergeant Martinez's testimony to be credible.

**F.  Ms. McGregor**

97.     Ms. McGregor is Defendant's grandmother.

98.     Ms. McGregor testified that she arrived at Defendant's residence at 10:45 a.m. or a little earlier, after she received a call from the owner of the residence telling her that McGregor had been arrested.

99.     She testified that, when she arrived, Defendant was handcuffed and sitting on the second story landing along with the other occupants of the house; and that she saw police officers going in and out of the apartment.

100.    On cross-examination, Ms. McGregor testified that she got the call that Defendant had been arrested between 10:00 a.m. and 11:00 a.m.

101.    Ms. McGregor estimated that there were six, seven or eight police officers at the scene and that it could have been as many as ten.

102.    Ms. McGregor testified that she saw Officer Schultz leaving in her car when she arrived but claimed that this occurred before noon.

103.    Ms. McGregor testified that, after a couple of hours, officers took McGregor; and when she asked if he was being arrested she was told no and that he would be right back.

104.    Ms. McGregor stayed until Defendant was taken to jail. Initially, she was sitting on the steps leading to the second story landing but later she went downstairs.

105.    Ms. McGregor did not see any officers draw their guns or be abusive.

106.    The undersigned finds that Ms. McGregor's claim that she arrived at her grandson's residence between 10:00 a.m. and 11:00 a.m. is not credible. Ms. McGregor also testified that, as she arrived, she saw Officer Schultz leaving; and the latter credibly testified that she left around noon and documented that Defendant's drug test at the probation office took place at 12:20 p.m.

### G. Mr. Barr

107.    Mr. Barr was staying at the McGregor residence on February 23, 2018.

108.    According to Mr. Barr, Officer Schultz came to the residence around 7:30 a.m. She talked to McGregor but did not step inside the apartment.

109.    Officer Schultz returned about one and a half to two hours later accompanied by police officers with guns, who told the occupants to put their hands up and head forward, handcuffed them, and brought them outside.

110.    According to Mr. Barr, Ms. McGregor came to the house after the MDPD officers arrived.

111.    Mr. Barr testified that he sat on the second story landing and observed four or five detectives take turns entering the house.

112.    When asked if the coming in and out occurred before 1:30 p.m., Mr. Barr initially said no; he then claimed it was hard for him to tell what time it was and on further prompting

said it was before 1:30 p.m.

113.    At one point, Mr. Barr learned that the officers were trying to get a search warrant. He claims to have overheard that there was a problem with the signatures.

114.    On cross-examination, Mr. Barr testified that he and Ms. McGregor had met with Defendant's counsel at Ms. McGregor's house. He claims to have told Defendant's counsel how the officers violated the search warrant, with Ms. McGregor listening to and participating in the conversation.

115.    Mr. Barr has been friends with McGregor since they were both in diapers. They have remained friends since and associate with the same people.

116.    Mr. Barr attended a suppression hearing conducted in the state court with regard to charges against Fernetus. At that hearing, he heard the officers' narratives regarding the events of February 23, 2018.

117.    The undersigned assigns no credibility to Mr. Barr's testimony, given the contradiction regarding the officer's coming in and out of the apartment (initially not before 1:30 p.m. and, after prompting, before 1:30 p.m.). The undersigned also finds that Mr. Barr's testimony was tainted by his attendance at the Fernetus suppression hearing.

## CONCLUSIONS OF LAW

McGregor seeks to suppress the following items which underlie the charges against him: the gun; and PII. Based on the foregoing factual findings and legal authorities, the undersigned concludes as follows.

*First*. *Officer Schultz had reasonable suspicion to justify a probation search of McGregor's residence.* Officer Schultz's reasons for deciding to conduct a probation search were: the strong odor of marijuana she perceived when conducting a probation visit of

McGregor's residence; the cars she saw in the parking lot that were totaled and that she learned belonged to the occupants of the residence; and the Snapchat picture of McGregor with a gun, about which she learned during her conversation with the City of Miami police sergeant prior to the probation search.  Viewing these facts objectively and taking into account the totality of the circumstances, including the terms of the Standardized Probation Orders, there was a sufficiently high probability that McGregor was engaged in criminal conduct to justify the probation search.  Knights, 534 U.S. at 121; Robinson, 515 F. App'x at 791-92; Perkins, 348 F.3d 965 at 970.

*Second.* *The evidence does not support Defendant's contention that the MDPD officers seized the gun and PII before obtaining the search warrant.*  In support of this contention, Defendant attacks the credibility of the MDPD officers and relies on the testimony of Ms. McGregor and Mr. Barr that they saw the officers coming in and out of the apartment before the warrant was issued.  However, the undersigned has found the testimony of the MDPD officers to be credible.  To the extent that there are some inconsistencies in their respective accounts of the events, the undersigned finds them to be minor and attributes them to the passage of time and varying memories.  The undersigned has also found Ms. McGregor's claim that she arrived at her grandson's residence between 10:00 a.m. and 11:00 a.m. not credible; and assigned no credibility to Mr. Barr's testimony.

## **RECOMMENDATION**

In accordance with the foregoing, the undersigned respectfully recommends that McGregor's Motion to Suppress [D.E. 20] be DENIED.  Pursuant to Local Magistrate Judge Rule 4(b), the parties have **fourteen days** from the date of this Report and Recommendation to file written objections, if any, with the Honorable Jose E. Martinez.  Failure to timely file objections shall bar the parties from attacking on appeal the factual findings contained herein.

See Resolution Tr. Corp. v. Hallmark Builders, Inc., 996 F.2d 1144, 1149 (11th Cir. 1993).

Further, "failure to object in accordance with the provisions of [28 U.S.C.] § 636(b)(1) waives

the right to challenge on appeal the district court's order based on unobjected-to factual and legal

conclusions." See 11th Cir. R. 3-1 (I.O.P. - 3).

      RESPECTFULLY SUBMITTED in Miami, Florida this 10th day of October, 2018.


                      *Alicia O. Reyes*

                ALICIA M. OTAZO-REYES
                UNITED STATES MAGISTRATE JUDGE


cc:    United States District Judge Jose E. Martinez
       Counsel of Record